UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Peter Ackerman ) | |
| 3229 R St NW ) | |
| Washington, DC 20007, ) | |
| ) | |
| International Center ) | |
| on Nonviolent Conflict ) | |
| 1775 Pennsylvania Avenue, N.W. ) | |
| Suite 1200 ) | |
| Washington, D.C. 20006, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case Number _____ |
| Steven York ) | |
| 8106 Flower Ave #F ) | |
| Takoma Park, MD 20912, ) | |
| ) | |
| Miriam Zimmerman ) | |
| 8106 Flower Ave #F ) | |
| Takoma Park, MD 20912, ) | |
| ) | |
| York Zimmerman Inc. ) | |
| 6856 Eastern Avenue N.W. ) | |
| Suite 212 ) | |
| Washington, D.C. 20012, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## **COMPLAINT**

Plaintiffs Peter Ackerman ("Ackerman") and the International Center on Nonviolent

Conflict ("ICNC") (collectively, "Plaintiffs") allege against Defendants Steven York ("York"),

Miriam Zimmerman ("Zimmerman"), and York Zimmerman Inc. ("YZI") (York, Zimmerman

and YZI collectively, "Defendants") as follows:

**NATURE OF ACTION**

1.      This is an action brought by ICNC, a nonprofit organization, and Peter Ackerman, its founding chair, to ensure that ICNC can use certain copyrighted documentary films and related educational materials to promote its educational mission on behalf of nonviolent civil resistance.  These documentary films (with a single exception of the film "Confronting the Truth") and related materials are all derived largely from content originally created by Ackerman, dating back to a doctoral dissertation he wrote while a graduate student at the Fletcher School of Law and Diplomacy at Tufts University in the 1970s.  Ackerman's thesis, "Strategic Aspects of Nonviolent Resistance Movements," and two books he co-authored, "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" and "A Force More Powerful: A Century of Nonviolent Conflict", are seminal written works, subject to copyright protection, in the field of nonviolent civil resistance.  Indeed, Ackerman founded ICNC to develop and share knowledge related to nonviolent civil resistance and its practice with interested recipients throughout the world.

2.      In 1996, Ackerman enlisted the services of York and Zimmerman, a husband and wife film production team that currently operates through YZI.  Ackerman introduced the Defendants to the field of nonviolent civil resistance, and offered to obtain and provide funding and oversee the production of a PBS television series and theatrical version, both derived from his seminal work in the field.  This initial venture, which resulted in the development of the documentary film and television series, both entitled "A Force More Powerful," marked the first of what turned out to be almost two decades of successful collaboration, based on the shared understanding that all product produced through collaboration between the parties would be jointly owned.

3.      Over the ensuing years, Ackerman, on his own behalf and on behalf of ICNC,
oversaw, made input into and all final decisions regarding, and funded four more documentaries.
Along with his colleagues at ICNC, Ackerman also provided various degrees of input, oversight,
and funding for several websites, games and related materials produced together or with
consultation between the two organizations that have become essential tools in fulfilling ICNC's
mission.

4.      On information and belief, Ackerman was also the primary, if not sole, source of
funding and support for Defendants during the parties' years of collaboration, having spent more
than $20.9 million to provide salaries for York and Zimmerman, to pay for their office space,
and to cover the costs associated with producing and distributing the documentaries and related
materials such as games and study guides used by ICNC.

5.      The fundamental premise behind this arrangement was that York and Zimmerman
(through and on behalf of YZI) and Ackerman (through and on behalf of ICNC) would jointly
own all rights in the works created through their collaboration.  Defendants' contribution was on
the film production end, while Plaintiffs' contribution entailed providing content, as well as
distributing and funding these documentaries and other works.

6.      The venture forged between Plaintiffs and Defendants worked reasonably well for
approximately twenty years, as ICNC regularly and routinely used and distributed the
documentaries and related materials as a joint owner, consistent with the parties' understanding
and with the knowledge of all Defendants.  This use included arranging more than 100
screenings and viewings of the documentaries by public and private audience, and worldwide
distribution of videocassettes and DVDs in more than twenty languages.

7.     Problems began to arise, however, when two unrelated but perhaps inevitable developments occurred.  First, the technological means for distributing the films evolved such that DVDs no longer would be practical, and online streaming would be essential to ensure that ICNC could continue with its mission, especially to provide access to the documentaries to tens of thousands of end users and the relevant public worldwide.  Second, Ackerman had decided that he no longer wanted to fund YZI, and advised it in the fall of 2014 to begin budgeting for a gradual phasedown of Ackerman's financial support that was planned to terminate in mid-2016.

8.     In February 2016, as they began planning for a change in support from their long-time financial benefactor—and as they contemplated the end of a collaboration that essentially defined YZI's work for nearly twenty years—Defendants suddenly refused to honor the arrangements that were forged with Ackerman's content, Ackerman's funding, and ICNC's promotion and distribution of the documentaries at issue in this case.  Specifically, on February 16, 2016, Defendants declared themselves sole owners of all rights in the documentary films and related materials, and insisted that Plaintiffs would need to receive a license from Defendants even to use the films and to pay a "licensing fee" to Defendant YZI.

9.     Because Defendants retain possession of the masters of the documentaries—which are needed to produce online streaming versions that will maintain the quality of the works Ackerman envisioned, personally worked on and paid for—their refusal to allow Plaintiffs access to those masters without entering into a license and paying a fee is a fundamental breach of their long-standing arrangement.  Furthermore, because demand for DVD versions is rapidly being replaced by demand for online versions, which are more readily distributed to the far-flung audience being targeted by ICNC, Defendants' refusal to provide access directly threatens ICNC's ability to fulfill a significant part of its mission.  Finally, Defendants' actions have

deprived Plaintiffs of the ability easily to obtain translations of the documentaries into languages beyond those into which they are already translated.

10.     Accordingly, and after making reasonable efforts to resolve this matter amicably, Plaintiffs are forced to seek judicial relief to ensure that their joint ownership of the copyrights and other rights in the documentaries and related materials, and their unfettered use and distribution thereof for the nonprofit use of ICNC, is not held hostage by Defendants' clear attempt to extort a "golden parachute" in the form of a royalty-based license.

11.     Plaintiffs now bring this action seeking a judicial declaration that Ackerman is a joint owner of the Documentary Films and Related Materials or, in the alternative, that Plaintiffs have a perpetual license to use and distribute the Documentary Films and Related Materials, which includes online streaming rights, and that Defendants are prohibited from withholding any and all source materials for the Documentary Films and Related Materials.  In addition to these declarations, Ackerman brings claims of fraud and unjust enrichment against York and Zimmerman, and seeks an accounting and reimbursement of all funds paid by Ackerman to the Defendants in connection with their joint collaboration on the Documentary Films and the Related Materials.

## **JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs' claims are predicated in part on the U.S. Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*

13.     This Court has supplemental jurisdiction over Plaintiffs' claims arising under the law of the District of Columbia pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

15.     Plaintiff Peter Ackerman is an individual residing in Washington, D.C.  He is the founding chair of ICNC.

16.     Plaintiff ICNC is a nonprofit educational foundation located at 1775 Pennsylvania Avenue, N.W., Suite 1200, Washington D.C. 20006.

17.     Defendants Steve York and Miriam Zimmerman are individuals residing in Takoma Park, MD.  They are principals of YZI.

18.     Defendant YZI is an independent production company with a principal office located at 6856 Eastern Avenue N.W. Suite 212, Washington D.C. 20012.

## FACTUAL ALLEGATIONS

19.     Peter Ackerman is one of the world's leading authorities on nonviolent conflict. He is the co-author of two books on nonviolent resistance: "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" and "A Force More Powerful: A Century of Nonviolent Conflict." He holds a Ph.D. in International Relations from the Fletcher School of Law and Diplomacy at Tufts University where he served for 15 years as the Chairman of the Board of Overseers. Dr. Ackerman is the Chairman of the U.S. Institute of Peace's International Advisory Council (IAC) and serves on the Advisory Board for America Abroad Media. He previously was a member of the Board of Directors of the Council on Foreign Relations and CARE, and served as Chairman of the Board of Trustees of Freedom House, a global, non-partisan voice for democracy and human rights.

- 6 -

20.     In 2002, Peter Ackerman and Jack DuVall founded the International Center on Nonviolent Conflict.

21.     ICNC is an independent, nonprofit educational foundation that develops and encourages the study and use of civilian-based, nonmilitary strategies aimed at establishing and defending human rights, democratic self-rule and justice worldwide.   It was nominated for a Nobel Peace Prize in 2013 and 2014, including in 2014 by previous Nobel laureates Lech Walesa and Thomas Schelling.  A more complete statement of ICNC's mission and guiding principles is found at https://www.nonviolent-conflict.org/about/icncs-mission/.

22.     Essential to ICNC's mission is its ability to screen and disseminate educational videos and other content about nonviolent resistance to interested recipients throughout the world.

23.     In the late 1990s, Ackerman and his production company, Santa Monica Pictures, collaborated with Defendants to produce, develop, and promote the original, copyright-protected theatrical film *A Force More Powerful*.  The film documented cases of nonviolent civil resistance in Nashville, India, and South Africa, and was released in theaters in 1999.

24.     The content of the film was based fundamentally on and adapted from the "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" book that Ackerman co-authored, and on the dissertation that Ackerman had developed when he was a graduate student at the Fletcher School of Law and Diplomacy at Tufts University in the 1970s.

25.     Ackerman simultaneously collaborated with Defendants to produce, develop, and promote the television series *A Force More Powerful*.   The television series documented six cases of nonviolent resistance: the three cases documented in the theatrical version, plus cases in Denmark, Poland, and Chile.  The television series aired on PBS in 2000.

26.     The content of the television series was based on and adapted from the "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" book co-authored by Ackerman and on the dissertation that Ackerman had developed when he was a graduate student at the Fletcher School of Law and Diplomacy at Tufts University in the 1970s. Ackerman also served as Series Editor, by which he had and exercised direct editorial control over the content of the television series.

27.     Messrs. Ackerman and DuVall co-authored the book "A Force More Powerful: A Century of Nonviolent Conflict" as a companion to the PBS television series of the same name.

28.     YZI, on behalf of Ackerman, YZI, and PBS member station WETA, submitted a copyright registration to the United States Copyright Office on October 8, 1999, by which York identified himself as "Author" of the theatrical version of *A Force More Powerful*, and identified as "Copyright Holder" YZI, Ackerman and WETA.   *See* Ex. A (Copyright Registration No. Pau002441399).

29.     After the release of *A Force More Powerful*, Ackerman and ICNC collaborated with YZI to produce, develop, edit, and promote four additional copyright-protected documentary films: *Bringing Down a Dictator*, *Orange Revolution*, *Egypt: Revolution Interrupted?*, and *Confronting the Truth*.  These four films, along with the theatrical and television versions of *A Force More Powerful*, are hereinafter referred to as the "Documentary Films."

30.     Ackerman and ICNC also collaborated with YZI to produce, develop, edit and promote certain materials that related to the Documentary Films or expanded content introduced in the films, including interview footage shot for the Documentary Films; trailers for the films; the "People Power: The Game of Civil Resistance" game, website (peoplepowergame.com), and

domain name; the "A Force More Powerful" website (aforcemorepowerful.org), domain name, and accompanying resource materials; the "A Force More Powerful: The Game of Nonviolent Strategy" game; the "Egypt: Revolution Interrupted?" website (egyptrevolutionmovie.com), domain name, and accompanying materials; the "Orange Revolution" website (orangerevolutionmovie.com), domain name, and accompanying materials; and the short film *Civil Resistance: A First Look*.  Ackerman and ICNC also supported and contributed to projects that resulted in the production of incomplete but tangible products, including the Workshop DVD and footage shot for possible documentaries in the Republic of Georgia and Venezuela. Collectively, all these materials in this paragraph are hereinafter referred to as the "Related Materials."

31.      The Documentary Films and Related Materials reflect the original, copyright-protected contributions of Ackerman, ICNC and YZI through the collaborative process that had been the hallmark of their nearly two decades of working together to develop content to promote ICNC's mission.

32.      For example, Ackerman sat with York of YZI through "rushes" (sections of filmed material before they were made part of the finished films) of every Documentary Film before it was released, and made suggestions as to shortening or lengthening segments, commented on the script along the way, and made suggestions concerning examples and concepts to include or omit.  Ackerman reviewed and provided editorial guidance and input on the films together with York, and Ackerman had final approval on all of the films before they were released.

33.      ICNC also was enlisted by YZI to review the content of written materials
associated with their collaboration with ICNC, including study guides, and was given final
approval rights before the Related Materials were distributed or translated.

34.      The Documentary Films and Related Materials were materially funded by
Ackerman and ICNC.  This funding, which over the years amounted to approximately $20.9
million, not only encompassed the direct costs of developing and producing content for the
Documentary Films and Related Materials, but also included payments of salary to York and
Zimmerman, as well as overhead of YZI (including health insurance for York and Zimmerman).
To this end, YZI submitted regular budgets, and invoiced Ackerman and ICNC as development
of the Documentary Films and Related Materials progressed.

35.      YZI has openly acknowledged Ackerman's contributions to developing the
content of the Documentary Films.

36.      The "A Force More Powerful" website,
http://www.aforcemorepowerful.org/whoWeAre/index.php, which is managed by YZI, describes
Ackerman and DuVall (the founding director of ICNC) as, together with York and Zimmerman,
the "creative team" behind *A Force More Powerful* and *Bringing Down a Dictator*.

37.      The website further acknowledges that York, Zimmerman, Ackerman, and
DuVall "began collaborating on projects concerning nonviolent action in 1996."  A screen shot
from that website is replicated below.



38.    YZI also acknowledged Ackerman's and ICNC's contributions to the Documentary Films by crediting Ackerman, DuVall, and ICNC as follows:

(i)    *A Force More Powerful*: Ackerman is credited as Series Editor & Principle Content Advisor.   Jack DuVall is credited as Executive Producer;

(ii)    *Bringing Down a Dictator*: Ackerman is credited as Executive Producer;

(iii)    *Orange Revolution*: Ackerman is credited as Executive Producer;

(iv)    *Egypt: Revolution Interrupted?*: Ackerman is credited as Executive Producer;

(v)    *Confronting the Truth*: Ackerman is credited as Executive Producer, and YZI described the film as "[a] [p]roduction of York Zimmerman Inc. in association with The United States Institute of Peace and the International Center on Nonviolent Conflict."

39.    For almost two decades, Defendants recognized that this history of collaboration with Ackerman and ICNC, and financial backing by Ackerman, established co-ownership of the Documentary Films and Related Materials.

40.    In fact, none of the Documentary Films would have been made but for Ackerman's contribution of content and his substantial financial support and approval.

41.    The parties mutually intended and understood that a central and material element of this collaboration was that Ackerman, as co-owner, would be able to use and distribute the Documentary Films and Related Materials worldwide in support of ICNC's mission, without limitation.

42.     For years, and consistent with the understanding of the parties, Ackerman and ICNC used and distributed the Documentary Films as they pleased with the knowledge of, and without objection from, YZI.  From 2000 to 2015 Ackerman and ICNC arranged more than 100 screenings and viewings of the Documentary Films for the public and for sizeable private audiences.  ICNC and Ackerman also donated or distributed tens of thousands of copies of the Documentary Films, with YZI's knowledge, worldwide and without limitation.

43.     One exception to this arrangement was a limited period of time when YZI had negotiated, on behalf of the parties, an exclusive arrangement with an educational distributor to sell the film *Orange Revolution* in the educational market (i.e., schools and libraries).  In March 2010, however, YZI advised ICNC, including Messrs. Ackerman and DuVall, that it had negotiated a new non-exclusive arrangement, and expressly acknowledged that effective March 10, 2010, both YZI and ICNC could distribute copies of *Orange Revolution* worldwide, in any language, without payment of a fee.

44.     Defendants, by their statements and conduct, confirmed that Plaintiffs had joint ownership of the Documentary Films and Related Materials, and never expressed any contrary understanding for so long as Ackerman reviewed and signed off on YZI's budgets, which included regular salary increases for York and Zimmerman.

45.     The situation changed, however, when after almost two decades of collaboration the Defendants embarked on a transparent shakedown of Ackerman.  Ackerman informed YZI in late 2014 that he wanted to tail off the relationship gradually, which resulted in a plan to fully end collaboration with and funding of YZI in June 2016.  The long period of lead time for ending funding was given by Ackerman as an accommodation to ease the transition for YZI.

46.     In 2016, it became logical for ICNC and Ackerman to stop using DVDs to distribute the Documentary Films, and instead to rely primarily on online streaming.  Ackerman informed York and Zimmerman that ICNC wanted to make the Documentary Films available online for free public viewing.  The objective was to promote ICNC's mission by using a distribution medium that was rapidly growing in importance, especially given the worldwide audience pursued by ICNC.  To provide for online streaming of the Documentary Films, however, ICNC required access to higher quality source materials that were jointly owned by Ackerman, but which were maintained by YZI in its corporate office.

47.     YZI acknowledged that Ackerman and ICNC were joint owners of the copyrights and other rights in the Documentary Films and Related Materials.  On February 4, 2016, York acknowledged to Ackerman during a meeting among the parties that all works created through the association of YZI, ICNC, and Ackerman were "jointly and severally held" by YZI, ICNC, and Ackerman.  On February 5, 2016, York again told ICNC that the works created through the association of YZI, ICNC, and Ackerman were "jointly and severally" held by YZI, ICNC, and Ackerman. York further told ICNC on Friday, February 5, 2016, that he would have master copies of all finished product delivered to ICNC within a week, by Friday, February 12.

48.     These statements by York are consistent with the arrangement that dates back to the very first collaboration between Ackerman and the Defendants, as it was always agreed and understood that Ackerman was the brainchild behind the Documentary Films and Related Materials, that these works were inspired by, shaped by, and adapted from his content, and also was the benefactor without whom none of those works ever would have been produced.

49.     However, YZI never delivered to ICNC master copies of all finished jointly owned product by February 12, 2016—and has not subsequently delivered to ICNC such master

copies—despite his statement on February 5, 2016, that he would do so.  Furthermore, on February 16, 2016, Ackerman was told by York and Zimmerman that he would need to sign a license agreement and pay YZI a licensing fee in order to use the Documentary Films, and that Ackerman and ICNC, even with such a license, would have only limited rights to use some of the films, which would not include Internet streaming.

50.     This was the first time that York or Zimmerman ever objected to Ackerman's or ICNC's use of the Documentary Films, and was the first that YZI suggested that it was the sole owner of the Documentary Films and Related Materials.  Before 2016, Defendants had never demanded and formally proposed that a license periodically renewable at their discretion would be needed before Ackerman or ICNC could use or distribute the Documentary Films without restriction.

51.     It is no coincidence that when the Defendants saw that the collaborative and funding relationship with Ackerman and ICNC was ending that the Defendants looked for a way to extort additional payments from Ackerman and ICNC by attempting to deprive Ackerman, for the first time, to his rights as joint owner.  Continued use and distribution of the Documentary Films and Related Materials is essential to ICNC's mission.  Without the ability to stream the Documentary Films online, ICNC faces distribution restrictions that were never contemplated and that are in fact contradicted by the longstanding understanding and agreement of the parties.

52.     Accordingly, Plaintiffs now bring this action seeking a judicial declaration that Ackerman is a joint owner of the Documentary Films and Related Materials with defendant YZI, and that Defendants are prohibited from withholding any and all source materials, including DVDs and electronic versions, for the Documentary Films and Related Materials.  In the alternative, Ackerman and ICNC seek a judicial declaration that they have a perpetual license to

use and distribute the Documentary Films and Related Materials, which includes online streaming rights, and that Defendants are prohibited from withholding any and all source materials for the Documentary Films and Related Materials.  In addition to these declarations, Ackerman brings claims of fraud and unjust enrichment against York and Zimmerman, and seeks an accounting and reimbursement of all funds paid by Ackerman to the Defendants in connection with their joint collaboration on the Documentary Films and the Related Materials.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT: JOINT OWNERSHIP**

</div>

53.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

54.     Plaintiffs and Defendants collaborated with each other for nearly twenty years with the intention that their copyrightable contributions be merged into inseparable or interdependent parts of a unitary whole, namely, the Documentary Films and Related Materials.

55.     Plaintiffs provided the content for the Documentary Films and Related Materials, which were all (with the exception of the film "Confronting the Truth") derived and adapted from Ackerman's seminal work in the field of nonviolent resistance. For example, Ackerman served as Series Editor of *A Force More Powerful* and exercised direct editorial control over the content of the series. Ackerman also sat through "rushes" of every Documentary Film before it was released, and made suggestions, ultimately adopted, as to shortening or lengthening segments, commented on the script along the way, and made suggestions, ultimately adopted, concerning scenes and concepts to include or omit. Defendants enlisted Ackerman to review the content of written materials, including study guides, and Plaintiffs were given final approval rights before the Related Materials were distributed or translated.

56.     The Documentary Films and Related Materials are "joint works" within the meaning of the Copyright Act, 17 U.S.C. §101. Ackerman is a "joint author" within the meaning of that Act.

57.     There is an actual, immediate, and justiciable controversy among Plaintiffs and Defendants regarding the ownership of copyright rights in the Documentary Films and Related Materials. Defendants have suddenly, and for the first time in almost two decades, asserted sole ownership.

58.     Plaintiffs are entitled to a declaratory judgment that they are co-owners of the copyrights in the Documentary Films and Related Materials and that, as co-owners, their use and distribution of the Documentary Films and Related Materials would not infringe any rights of Defendants, and further that Defendants are prohibited from withholding any and all source materials for the Documentary Films and Related Materials.

## SECOND CLAIM FOR RELIEF (IN THE ALTERNATIVE)
## DECLARATORY JUDGMENT: ORAL OR IMPLIED LICENSE

59.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

60.     Plaintiffs paid Defendants approximately $20.9 million to produce the Documentary Films and Related Materials.

61.     For almost twenty years, Defendants understood and, through their affirmative statements and conduct, acknowledged that beyond any rights to co-ownership, Plaintiffs had a perpetual right to use and distribute the Documentary Films and Related Materials which constitutes, at a minimum, a perpetual copyright license. This license was manifested in express oral statements made by Defendants, such as York's acknowledgment that all works created through the association of YZI, ICNC, and Ackerman were "jointly and severally held" by YZI,

ICNC, and Ackerman, as well as Zimmerman's written acknowledgment that Plaintiffs could

distribute copies of *Orange Revolution* anywhere in the world.

62.     Plaintiffs' license to use and distribute the Documentary Films and Related

Materials was also implied by Defendants' conduct. For example, Plaintiffs have arranged

screenings and viewings of the Documentary Films for the public and sizeable private audiences

more than 100 times in the past eighteen years and distributed tens of thousands of

videocassettes and DVDs of the films around the world in more than twenty languages.

Defendants are aware of, and had never objected to, such screenings or distribution, and they

actively assisted Plaintiff's efforts to do so.

63.     There is an actual, immediate, and justiciable controversy among Plaintiffs and

Defendants regarding Plaintiffs' rights to use the Documentary Films and Related Materials.

Plaintiffs desire to stream the Documentary Films and Related Materials online, but Defendants

have not only asserted exclusive ownership over them, but have wrongfully denied Plaintiffs the

right to use the Documentary Films and Related Materials without improperly demanding

additional consideration and restricting such license rights.

64.     Plaintiffs are entitled to a judgment declaring that they have a perpetual license,

including a copyright license, to use and distribute the Documentary Films and Related

Materials, which includes online-streaming rights, and that Defendants are prohibited from

withholding any and all source materials for the Documentary Films and Related Materials.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**FRAUD**

</div>

65.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this

complaint as if fully set forth herein.

66.     Defendants fraudulently induced Plaintiffs to enter into joint enterprise of nearly twenty years whereby Plaintiffs would devote significant time, money and expertise, ostensibly for the joint benefit of both parties. Over the course of this joint enterprise, Defendants induced Plaintiffs to pay $20.9 million in funding to Defendants based on Defendants' false representations that Plaintiffs would have joint ownership rights or, alternatively, unlimited license rights, in all works created by the enterprise, including the unfettered right to use and distribute the works.

67.     Defendants made numerous false representations to Plaintiffs to lead them to believe that, because they were providing the content, supervision, and funding for the Documentary Films and Related Materials, Plaintiffs would have joint ownership rights in the works. For example, in a February 28, 2006 e-mail to Jack DuVall of ICNC, York stated that because "ICNC pays the bills," it was "entitled to call the tune."

68.     Similarly, on March 10, 2010, Miriam Zimmerman wrote in an e-mail to Peter Ackerman, Jack DuVall, and others that she was able to negotiate a new arrangement with an education distributor for Orange Revolution whereby the distributor's deal to sell the film in the educational market would be non-exclusive.  Zimmerman stated, "This means, effective today, March 10, 2010, YZI *and ICNC* can sell/donate/distribute copies of Orange Rev[olution] to schools and libraries *anywhere in the world*, *in any language*, without having to pay [the distributor] a fee." (emphases added).

69.     Defendants' false representations to Plaintiffs regarding their ownership rights in the Documentary Films and Related Materials were material. Plaintiffs never would have invested millions of dollars in the joint enterprise had they known Defendants would assert the unilateral right to effectively cut off distribution of the works.

70.     Defendants made the false representations for the purpose of inducing Plaintiffs to fund them, but never intended to respect Plaintiffs' joint-ownership rights. Only when Plaintiffs began to phase down their funding of Defendants did Defendants reveal their true intentions— that, after twenty years and $20.9 million from Plaintiffs, Defendants would assert *sole* ownership of the Documentary Films and Related Materials, demanding that Defendants sign a license agreement and pay a royalty.

71.     Plaintiffs relied on Defendants' representations to their detriment. They provided millions of dollars of funding to Defendants in reliance on their representations that they would produce the Documentary Films and Related Materials and that Plaintiffs and Defendants would own them jointly, with unlimited rights to use and distribute them.

72.     As a result of Defendants' fraud, Plaintiffs have been deprived of the valuable right to exploit the Documentary Films and Related Materials that would not exist without Plaintiffs' contributions of content, supervision, and funding. Accordingly, Plaintiffs are entitled to a return of the $20.9 million that they paid Defendants in reliance of their false representations.

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

73.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

74.     In addition to the services Plaintiffs provided Defendants discussed above, Plaintiffs also conferred a benefit on Defendants in the form of approximately $20.9 million in funding to produce the Documentary Films and Related Materials.

75.     Defendants have retained that benefit under circumstances that are unjust. The parties mutually intended and understood that Plaintiffs would be co-owners of the Documentary

Films and Related Materials, but now Defendants claim that they are their sole owners. Plaintiffs never would have funded Defendants had they known Defendants would assert the unilateral right to effectively cut off distribution of the Documentary Films and Related Materials.

76.     Plaintiffs are therefore entitled to the fair value of their contributions to the resulting profits, proceeds, and exploitation of the Documentary Films and Related Materials realized by Defendants, including without limitation disgorgement of all "salary" paid to defendants York and Zimmerman.

## FIFTH CLAIM FOR RELIEF
## ACCOUNTING

77.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

78.     By virtue of their co-ownership of the Documentary Films and Related Materials, Plaintiffs are entitled to an accounting by Defendants of all revenue earned from the Documentary Films and Related Materials, pursuant to which Plaintiffs can determine the money rightfully belonging to them.

79.     Plaintiffs are further entitled to an accounting of all funds paid by Ackerman to the Defendants in connection with their joint collaboration on the Documentary Films and the Related Materials.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.     Declaring that Plaintiffs are co-owners of the rights, including the copyrights, in the Documentary Films and Related Materials, and that Defendants are prohibited from withholding from Plaintiffs masters or electronic versions of the works at issue.

2.      In the alternative, declaring that Plaintiffs hold an irrevocable and perpetual

license, including a copyright license, to use and distribute the Documentary Films and Related

Materials in all manner and media now existing and hereinafter created, including without

limitation online streaming rights, and that Defendants are prohibited from withholding any and

all source materials for the Documentary Films and Related Materials.

3.      Awarding Plaintiffs monetary relief comprising, among other things, the

approximately $20.9 million in funding that Plaintiffs provided Defendants, as well as attorneys'

fees and costs.

<div style="margin-left:45%">

By   /s/ William M. Bosch
    William M. Bosch (D.C. Bar No. 444247)
    ARNOLD & PORTER LLP
    601 Massachusetts Ave., NW
    Washington, DC  20001-3743
    Telephone: +1 202.942.5000
    Fax: +1 202.942.5999
    E-mail:  william.bosch@aporter.com

    *Counsel for Plaintiffs*

</div>

*Of Counsel*:

Roberta L. Horton
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
E-mail:  roberta.horton@aporter.com


Dated:  October 14, 2016