UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Peter Ackerman<br>3229 R St NW<br>Washington, DC 20007,<br><br>International Center<br>on Nonviolent Conflict<br>1775 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C. 20006,<br><br>       Plaintiffs,<br><br>  v.<br><br>Steven York<br>8106 Flower Ave #F<br>Takoma Park, MD 20912,<br><br>Miriam Zimmerman<br>8106 Flower Ave #F<br>Takoma Park, MD 20912,<br><br>York Zimmerman Inc.<br>6856 Eastern Avenue N.W.<br>Suite 212<br>Washington, D.C. 20012,<br><br>     Defendants. | Case Number 16-cv-02052 RDM |

**PROPOSED SECOND AMENDED COMPLAINT**

Plaintiffs Peter Ackerman ("Ackerman") and the International Center on Nonviolent

Conflict ("ICNC") (collectively, "Plaintiffs") allege against Defendants Steven York ("York"),

Miriam Zimmerman ("Zimmerman"), and York Zimmerman Inc. ("YZI") (York, Zimmerman

and YZI collectively, "Defendants") as follows:

## NATURE OF ACTION

1.      This is an action brought by ICNC, a nonprofit organization, and Peter Ackerman, its founding chair, to ensure that ICNC can use certain copyrighted documentary films and related educational materials to promote its educational mission on behalf of nonviolent civil resistance.

2.      Ackerman jointly created the films with York through a decades-long creative collaboration that, as detailed herein, extended to Ackerman's selection, arrangement, and placing of his original works into tangible media of expression in the documentary films at issue in this case.  Ackerman's creative contributions played an integral role at every stage of the development of the films.  Ackerman and York collaboratively selected the example(s) of nonviolent civil resistance that their films would portray.  They jointly chose what footage to include in the films to best achieve the films' educational objectives.  And Ackerman sat with York for hundreds of hours deciding how to place excerpts of interviews and other segments (which resulted in final content in the films), which aspects of the footage they should emphasize, and what themes the films would try to convey.  Ackerman's contributions to the films went well beyond supplying "ideas" or "concepts"; rather, he made creative contributions of original expression that are subject to copyright protection.

3.      Ackerman and York always intended that their respective independent contributions to the films would be merged into inseparable and interdependent parts of a unitary whole.  The parties manifested this intent in many ways.  At the beginning of their collaboration, Ackerman and York agreed that Ackerman would be a co-owner of any films they jointly created and that, as a co-owner, Ackerman would have full, unfettered access to the master copies of the films and all source materials.  The parties further agreed that Ackerman would have final

approval on all of the films, and would be able to use the films however he wanted as part of his mission to disseminate teachings and research on nonviolent civil resistance to dissidents around the globe.

3.4.    Consistent with this agreement, fFor years, Ackerman and ICNC used and distributed the films as they pleased with the knowledge of, and without objection from, the Defendants.  York also told Ackerman that he understood the films to be "jointly and severally held" by Ackerman and Defendants.  This was all consistent with the fact that Ackerman and York jointly created the films through their respective creative contributions.

4.5.    Ackerman's contributions to the films went well beyond supplying ideas. The films at issue here (with the exception of "Confronting the Truth") and related materials drew largely from content originally created by Ackerman, dating back to a doctoral dissertation he wrote while a graduate student at the Fletcher School of Law and Diplomacy at Tufts University in the 1970s.  Ackerman's thesis, "Strategic Aspects of Nonviolent Resistance Movements," and two books he co-authored, "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" and "A Force More Powerful: A Century of Nonviolent Conflict," are seminal written works, subject to copyright protection, in the field of nonviolent civil resistance. Indeed, Ackerman founded ICNC to develop and share knowledge related to nonviolent civil resistance and its practice with interested recipients throughout the world.

5.6.    In 1996, Ackerman enlisted the services of York and Zimmerman, who currently operate through their production company, YZI.  Ackerman introduced the Defendants to the field of nonviolent civil resistance, and offered to help obtain and provide funding and oversee the production of a PBS television series and theatrical version, both derived from his seminal work in the field.  This initial venture, which resulted in the development of the documentary

film and television series, both entitled "A Force More Powerful," marked the first of what turned out to be almost two decades of successful collaboration, based on the shared understanding that all product produced through collaboration between the parties would be jointly owned.

7.     The relationship between the parties had all of the attributes of a traditional "work for hire" arrangement.  From the beginning, Ackerman controlled how the projects would develop.  He told Defendants what films to make, when to make them, and ultimately had final say on the content of all of the films.  In return for Defendants' labor, Ackerman paid Defendants a salary of upwards of $500,000 a year and also funded their rent and overhead, including health-insurance and other benefits.  Defendants worked only for Ackerman, and had no other significant sources of income during the relevant time period.

6.8.     Over the ensuing years,As the mastermind behind the films,  Ackerman, on his own behalf and on behalf of ICNC,  oversaw, provided creative input into, selected and arranged scenes in, made all final decisions regarding, and funded four more documentaries. Along with his colleagues at ICNC, Ackerman also provided various degrees of input, oversight, and funding for several websites, games and related materials produced together or with consultation between the two organizations that have become essential tools in fulfilling ICNC's mission.

7.9.     On information and belief,Ackerman was also the primary, if not sole, source of funding and support for Defendants during the parties' years of collaboration, having spent more than $20.9 million to provide salaries for York and Zimmerman, to pay for their office space, and to cover the costs associated with producing and distributing the documentaries and related materials such as games and study guides used by ICNC.

8.10.    The fundamental premise behind this arrangement was that York and Zimmerman (through and on behalf of YZI) and Ackerman (through and/or on behalf of ICNC) would jointly own all rights in the works created through their collaboration.  Defendants' contribution was on the film production end, while Plaintiffs' contribution entailed making sure the documentary films were properly illustrating the critical ideas, concepts and strategic principles (identified in Ackerman's wok) that explain how to win.  To this end, Ackerman provided originalproviding creative input, including the the development of narrative and insertion of visual images and narrative, as well asand distributing distributed and funding funded these documentaries and other works.

9.11.    The venture forged between Plaintiffs and Defendants worked reasonably well for approximately twenty years, as ICNC regularly and routinely used and distributed the documentaries and related materials as a joint owner, consistent with the parties' understanding and with the knowledge of all Defendants.  This use included arranging more than 100 screenings and viewings of the documentaries by public and private audience, and worldwide distribution of videocassettes and DVDs in more than twenty languages.

12.    Problems began to arise, however, when two unrelated but perhaps inevitable developments occurred.  First, the technological means for distributing the films evolved such that DVDs no longer would be practical, and online streaming would be essential to ensure that ICNC could continue with its mission, especially to provide access to the documentaries to tens of thousands of end users and the relevant public worldwide.  Second, Ackerman had decided that he no longer wanted to fund YZI, and advised it in the fall of 2014 to begin budgeting for a gradual phasedown of Ackerman's financial support that was planned to terminate in mid-2016.

10.13.  As part of this phasedown, the parties, in early 2015, discussed transferring the films and other materials to ICNC so that ICNC would be able to continue to use them to advance its educational mission.  Defendants specifically represented that they would hand over physical possession of certain materials, including valuable raw interview footage, to ICNC as part of the wind down.  In reliance on these promises, Ackerman and ICNC continued to pay Defendants hundreds of thousands of dollars in 2015.  Defendants further represented that they would make the parties' latest film, *Egypt: Revolution Interrupted?*, available online for free to anyone who wished to stream it, which was consistent with the parties' long-held agreement that the purpose of the films was not to turn a profit, but to disseminate principles of strategic nonviolent conflict to as broadly as possible to dissidents around the globe.

11.14.  In February 2016, in connection with discussions about making all of the films available online for streaming, Defendants reaffirmed their promise to deliver the masters of all of the films to Plaintiffs.  Defendant Steven York specifically promised Hardy Merriman, the President of ICNC, that he would deliver these materials within a week.  But then, as Defendants as they began planning for a change in support from their long-time financial benefactor—and as they contemplated the end of a collaboration that essentially defined YZI's work for nearly twenty years, they —Defendants suddenly refused to honor the arrangements that were forged with Ackerman's creative contributions, Ackerman's funding, and ICNC's promotion and distribution of the documentaries at issue in this case.  Specifically, on February 16, 2016, Defendants declared themselves sole owners of all rights in the documentary films and related materials, and insisted that Plaintiffs would need to receive a license from Defendants even to use the films and to pay a "licensing fee" to Defendant YZI.

~~12.~~15.   Because Defendants retain possession of the masters of the documentaries—

which are needed to produce online streaming versions that will expand international use of and

will maintain the quality of the works Ackerman envisioned, jointly created and personally paid

for—their refusal to allow Plaintiffs access to those masters without entering into a license and

paying a fee is a fundamental breach of their long-standing arrangement.  Furthermore, because

demand for DVD versions is rapidly being replaced by demand for online versions, which are

more readily distributed to the far-flung audience being targeted by ICNC, Defendants' refusal to

provide access directly threatens ICNC's ability to fulfill a significant part of its mission.

Finally, Defendants' actions have deprived Plaintiffs of the ability easily to obtain translations of

the documentaries into languages beyond those into which they are already translated.

~~13.~~16.   Accordingly, and after making reasonable efforts to resolve this matter amicably,

Plaintiffs are forced to seek judicial relief to ensure that their joint ownership of the copyrights

and other rights in the documentaries and related materials, and their unfettered use and

distribution thereof for the nonprofit use of ICNC, is not held hostage by Defendants' clear

attempt to extort a "golden parachute" in the form of a royalty-based license.

~~14.~~17.   Plaintiffs now bring this action seeking a judicial declaration that Ackerman is a

joint owner of the Documentary Films and Related Materials or, in the alternative, that Plaintiffs

have a perpetual license to use and distribute the Documentary Films and Related Materials,

which includes online streaming rights, and that Defendants are required to provide Plaintiffs

with master copies and any other source materials for the Documentary Films and Related

Materials~~prohibited from withholding any and all source materials for the Documentary Films~~

~~and Related Materials~~.  In addition to these declarations, Ackerman brings claims of breach of

contract, fraud, negligent misrepresentation, and unjust enrichment against York and

Zimmerman, and seeks an accounting ~~and reimbursement~~ of all funds paid by Ackerman to the Defendants in connection with their joint collaboration on the Documentary Films and the Related Materials.

## JURISDICTION AND VENUE

~~15.~~18.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs' claims are predicated in part on the U.S. Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*

~~16.~~19.  This Court has supplemental jurisdiction over Plaintiffs' claims arising under the law of the District of Columbia pursuant to 28 U.S.C. § 1367(a).

~~17.~~20.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

~~18.~~21.  Plaintiff Peter Ackerman is an individual residing in Washington, D.C.  He is the founding chair of ICNC.

~~19.~~22.  Plaintiff ICNC is a nonprofit educational foundation located at 1775 Pennsylvania Avenue, N.W., Suite 1200, Washington D.C. 20006.

~~20.~~23.  Defendants Steve York and Miriam Zimmerman are individuals residing in Takoma Park, MD.  They are principals of YZI.

~~21.~~24.  Defendant YZI is an independent production company with a principal office located at 6856 Eastern Avenue N.W. Suite 212, Washington D.C. 20012.

## FACTUAL ALLEGATIONS

~~22.~~25.  Peter Ackerman is one of the world's leading authorities on nonviolent conflict. He is the co-author of two books on nonviolent resistance: "Strategic Nonviolent Conflict: The

Dynamics of People Power in the Twentieth Century" and "A Force More Powerful: A Century of Nonviolent Conflict."  He holds a Ph.D. in International Relations from the Fletcher School of Law and Diplomacy at Tufts University where he served for 15 years as the Chairman of the Board of Overseers.  Dr. Ackerman is the Chairman of the U.S. Institute of Peace's International Advisory Council (IAC), is an Executive Committee member of the Board of Directors of the Atlantic Council, and serves on the Advisory Board for America Abroad Media.  He previously was a member of the Board of Directors of the Council on Foreign Relations and CARE, and served as Chairman of the Board of Trustees of Freedom House, a global, non-partisan voice for democracy and human rights.

23.26.  In 2002, Peter Ackerman and Jack DuVall founded the International Center on Nonviolent Conflict.

24.27.  ICNC is an independent, nonprofit educational foundation that develops and encourages the study and use of civilian-based, nonmilitary strategies aimed at establishing and defending human rights, democratic self-rule and justice worldwide.  It was nominated for a Nobel Peace Prize in 2013 and 2014, including in 2014 by previous Nobel laureates Lech Walesa and Thomas Schelling.  A more complete statement of ICNC's mission and guiding principles is found at https://www.nonviolent-conflict.org/about/icncs-mission/.

25.28.  Essential to ICNC's mission is its ability to screen and disseminate educational videos and other content about nonviolent resistance to interested recipients throughout the world.

29.     In the late 1990s, Ackerman met with Steven York, a filmmaker, to discuss making movies that would illustrate the principles of successful nonviolent conflicts articulated in Ackerman's scholarship.  Ackerman and York agreed that Ackerman would be a co-owner of

- 9 -

any films that were jointly created and that, as a co-owner, Ackerman would have full, unfettered access to anything Ackerman and York created together, including the master copies of the films. The parties further agreed that Ackerman would have final approval on all of the films, and would be able to use the films however he wanted as part of his mission to disseminate teachings and research on nonviolent civil resistance.

26.30.  Consistent with this agreement, Ackerman and his production company, Santa Monica Pictures, collaborated with Defendants to produce, develop, and promote the original, copyright-protected theatrical film *A Force More Powerful*.  The film documented cases of nonviolent civil resistance in Nashville, India, and South Africa, and was released in theaters in 1999.

27.31.  The content of the film was based fundamentally on and adapted from the "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" book that Ackerman co-authored, and on the dissertation that Ackerman had developed when he was a graduate student at the Fletcher School of Law and Diplomacy at Tufts University in the 1970s.

28.32.  Ackerman simultaneously collaborated with Defendants to produce, develop, and promote the television series *A Force More Powerful*.   The television series documented six cases of nonviolent resistance: the three cases documented in the theatrical version, plus cases in Denmark, Poland, and Chile.  The television series aired on PBS in 2000.

29.33.  The content of the television series was based on and adapted from the "Strategic Nonviolent Conflict: The Dynamics of People Power in the Twentieth Century" book co-authored by Ackerman and on the dissertation that Ackerman had developed when he was a graduate student at the Fletcher School of Law and Diplomacy at Tufts University in the 1970s.

Ackerman also served as Series Editor & Principal Content Advisor, by which he shared and exercised direct editorial control over the content of the television series.

~~30.~~34.  Messrs. Ackerman and DuVall co-authored the book "A Force More Powerful: A Century of Nonviolent Conflict" as a companion to the PBS television series of the same name.

~~31.~~35.  YZI, on behalf of Ackerman, YZI, and PBS member station WETA, submitted a copyright registration to the United States Copyright Office on October 8, 1999, by which York identified himself as "Author" of the theatrical version of *A Force More Powerful*, and identified as "Copyright Holder" YZI, Ackerman and WETA.  *See* Ex. A (Copyright Registration No. Pau002441399).

~~32.~~36.  After the release of *A Force More Powerful*, Ackerman and ICNC collaborated with YZI to produce, develop, edit, and promote four additional copyright-protected documentary films: *Bringing Down a Dictator*, *Orange Revolution*, *Egypt: Revolution Interrupted?*, and *Confronting the Truth*.  These four films, along with the theatrical and television versions of *A Force More Powerful*, are hereinafter referred to as the "Documentary Films."

37.     Ackerman and ICNC also collaborated with YZI to produce, develop, edit and promote certain materials that related to the Documentary Films or expanded content introduced in the films, including interview footage shot for the Documentary Films; trailers for the films; the "People Power: The Game of Civil Resistance" game, website (peoplepowergame.com), and domain name; the "A Force More Powerful" website (aforcemorepowerful.org), domain name, and accompanying resource materials; the "A Force More Powerful: The Game of Nonviolent Strategy" game; the "Egypt: Revolution Interrupted?" website (egyptrevolutionmovie.com), domain name, and accompanying materials; the "Orange Revolution" website

(orangerevolutionmovie.com), domain name, and accompanying materials; and the short film *Civil Resistance: A First Look*.  Ackerman and ICNC also supported and contributed to projects that resulted in the production of incomplete but tangible products, including the Workshop DVD and footage shot for possible documentaries in the Republic of Georgia and Venezuela. Collectively, all these materials in this paragraph are hereinafter referred to as the "Related Materials."

38.     The Documentary Films and Related Materials are "works made for hire" within the meaning of the Copyright Act, 17 U.S.C. § 101.  Ackerman controlled both the manner and the means by which the Documentary Films and Related Materials were created.  He told Defendants what films to make, when to make them, and ultimately had final say on the content of all of the films.  In return for Defendants' labor, Ackerman paid Defendants a salary of upwards of $500,000 a year and also funded their rent and overhead, including health-insurance and other benefits.  Defendants worked only for Ackerman, and had no other significant sources of income other than him.

39.     The Documentary Films and Related Materials reflect the original, copyright-protected contributions of Ackerman, ICNC and YZI through the collaborative process that had been the hallmark of their nearly two decades of working together to develop content, in part to promote Ackerman's and, starting with its founding in 2002, ICNC's mission.

33.40.  As part of this collaborative process, Ackerman and York would select the stories they wanted to tell, the locations where they would shoot, and the characters they would use for the films.  Ackerman and York made these creative choices in a countless number of conversations that the two of them had over the years that they were creating the films.

41.     ~~For example,~~ During the production process, Ackerman sat with York of YZI through "rushes" (sections of filmed material before they were made part of the finished films) of every Documentary Film.  Ackerman's contributions during these sessions was crucial to ensuring that the films conveyed Ackerman's teachings, as he was the subject matter expert for all of the films.  Ackerman provided input on the "dynamics" of the scene, meaning how the scene was constructed—using narration, interviews, and video footage—to convey a message or theme.  Ackerman ~~before it was released, and~~ gave direction as to shortening or lengthening segments, commented on the script along the way, gave direction concerning examples to include or omit, and often insisted on substantive changes that emphasized key aspects of events covered by the films which otherwise would not have been included—changes reflected in the final products, namely, the films.  Ackerman reviewed and provided editorial guidance and input on the films together with York, and Ackerman had final approval on all of the films before they were released.

~~34.~~ 42.  Because of the organic nature of this collaborative process, it is impossible to separate out Ackerman's contributions from York's.  It is impossible to tell, for example, whose input led to one scene being in the film or not, or how the scenes would be arranged.  During the production process, York kept notes of the input Ackerman provided, but York has since deleted or destroyed the notes.

~~35.~~ 43.  ~~This~~ The collaborative process reflects the understanding of both York and Ackerman that the documentaries were not to be merely historical depictions, but rather would be oriented to fulfill Ackerman's educational objectives.  That is why Ackerman reviewed rushes used in the Documentary Films.  He was not merely supplying direction or ideas; he was

overseeing and making specific suggestions and changes in the substantive narrative that connected each of the events covered within the films and between the films.

36.44.  This substantive narrative all tracks directly to Ackerman's teachings, and not to any especially unique or creative insights originated by York.  At the start of their collaboration, Ackerman insisted that York read and understand the twelve strategic principles Ackerman outlines in his seminal book *Strategic Nonviolent Conflict*.

37.45.  Ackerman and York used each segment of the Documentary Films to illustrate one or more of those twelve strategic principles, which are embodied tangibly in the films.  Using just the scenes from *A Force More Powerful* on nonviolent conflict in India during the colonial era as an example of Ackerman's creative contributions to all of the Documentary Films, Ackerman ensured that the program narrative and statements of interviewees illustrated nine of these twelve principles.

38.46.  By way of illustration, in the opening segment of *A Force More Powerful*, Ackerman and York jointly selected and decided to use a montage of images of tactics dissidents used, including for example the burning of registration papers.

39.47.  Ackerman and York's selection and placement of this tangible montage served a creative and educational purpose that goes beyond mere recitation or depiction of historical facts; rather, it expressed the importance of using a diversity of nonviolent resistance tactics.  This is one of the twelve strategic principles Ackerman argued had to be developed for movements to be effective.

40.48.  Ackerman devoted countless hours working with York to ensure that each of Ackerman's strategic principles would be effectively conveyed through the Documentary Films.  Ackerman expressed his ideas and/or directed, supervised and edited the expression of his ideas,

through concrete, visible images and narrative elements that he included in each of the Documentary Films.

41.49.  Again using the opening segment of *A Force More Powerful* to illustrate the point, Ackerman and York collaborated to ensure that Ackerman's twelve strategic principles of nonviolent conflict drove the creative process, such that essentially every scene and narrative element can be tied to one of Ackerman's twelve strategic principles of nonviolent resistance (*e.g.*, "Gandhi understands that British control of India depends on Indians' cooperation" (depicts Ackerman principle #10); "Gandhi turns inward in search of a nonviolent strategy for freedom" (depicts Ackerman principle #9); "Gandhi decides he'll begin by challenging the British monopoly on salt" (depicts Ackerman principle #1); "Gandhi realizes that a long march will build suspense and a bigger audience" (depicts Ackerman principle #2)).  It was only through Ackerman's contribution in selecting and arranging these scenes and the accompanying narrative that the Documentary Films achieved his creative vision, as ultimately it was Ackerman who controlled what was included and what was omitted from the films.

42.50.  Ackerman's creative input ranged from granular details to the overall thematic and narrative elements of the Documentary Films.  Referring again to the India sequence in *A Force More Powerful*, it was Ackerman and not York who insisted on featuring Gandhi's salt march.  There were many historically significant aspects of the nonviolent movement in India that preceded and followed the salt march, but Ackerman wanted to use Gandhi's more than 200-mile march to the beach, where he took some dirt and threw it in a pot of boiling water to separate out salt, to illustrate Ackerman's strategic principles.  In this instance, Ackerman understood that Gandhi's unlawful but elegant and nonviolent act would spark empathy, as salt is essential to life and civil order could not be maintained by the British Colonial power if tens of

thousands of Gandhi's supporters followed his example.  Ackerman, not York, insisted that the salt march be included in the film, and directed where in the film it was to be tangibly placed to set the context for all that follows.

43.51.  Additionally, Ackerman and York, as joint authors, together went to England and sat continuously with the narrator of *A Force More Powerful*, award-winning actor Ben Kingsley, in a recording studio to coach Kingsley.  Ackerman wasn't there to check technical quality; that was York's role.  Rather, Ackerman was there to make sure that Kingsley's intonation and emphasis advanced the meaning and understanding of the concepts that Ackerman wanted the film to depict.

44.52.  Critically, Ackerman was concerned that Kingsley might confuse the India segment in the documentary as a similar vehicle to his Academy Award-winning depiction of Gandhi on the big screen.  As with all of the Documentary Films, Ackerman's creative goal was altogether different; he wanted to develop films that would be useful to dissident groups because they illustrated effective tactics, rather than aggrandizing individuals and promoting the "feel good" ethos that typifies other films in this genre.  To that end, Ackerman provided direction to Mr. Kingsley several times during the recording of the narrative to ensure that Kingsley understood and captured Ackerman's creative objective.

45.53.  Essentially every clip of film or narrative element of *A Force More Powerful* and the other Documentary Films reflects Ackerman's creative control and direction.  And when there were disagreements, it was Ackerman who made the final call on each film's content.

46.54.  For example, in *A Force More Powerful*, Ackerman and York initially disagreed over the content in the film's segment on the civil rights movement in the United States.  York, consistent with what had been done by other documentarians, wanted to focus on the ethical

underpinnings of nonviolence.  Ackerman, by contrast, wanted to create films that would be useful to dissidents.  Many of Ackerman's target viewers were making life and death decisions; they didn't need reminders of their ethical groundings but rather thirsted for direction as to what tactics work and when they are properly deployed.  Ackerman insisted, and York ultimately conceded, that the films must not conflate nonviolence as an ethical principal with nonviolent resistance as a strategic approach to overcoming oppression and winning conflicts against tyrants.

47.55.  Thus, the film focused on the lunch-counter sit-ins organized by James Lawson. Lawson, a key strategist for the  civil rights movement in the United States, became one of ICNC's most ardent supporters because, in his view, Ackerman's creative approach to the Documentary Films was more effective and useful than other films covering the civil rights movement and other examples of nonviolent resistance.  In short, Lawson validated Ackerman's creative direction.

48.56.  Through Ackerman's creative input and control, York developed a sense of what Ackerman wanted to include in the Documentary Films.  In some instances, York would identify a suitable example, and would bring it to Ackerman to review.  For example, in *A Force More Powerful*, York identified the consumer boycott in Port Elizabeth, South Africa as an example of nonviolent resistance that could be used to illustrate Ackerman's strategic principles.  Ackerman then worked with York to ensure that the specific elements used in the film demonstrated the link between the boycott and the impact on the white  economic community and the pressure the black economic community in turn placed on the white community.  Ackerman insisted on using examples that would debunk the myth that Nelson Mandela was critical during this period because he was advocating for an armed revolution.  Ackerman instructed York to interview

police who were in Port Elizabeth during this period to ask them which was more effective—the boycott or armed resistance.  Ackerman then reviewed the tapes, looking for examples of police defection that could be used to illustrate his strategic principles.  Ackerman told York what clips and interviews Ackerman needed to make the films he had in mind.  York then located such clips and, under Ackerman's control, put them in the Documentary Films.

49.57.  This collaborative process, by which Ackerman directed which subject matter was included, how the subject matter was presented, and the narrative linking the film clips to advance his educational objectives, was behind the development of each and every one of the Documentary Films.

50.58.  Likewise, Ackerman insisted that the film *Orange Revolution* focus on his strategic principles and related factors he had identified in his continuing study of nonviolent resistance.  Ackerman recognized that when the first election occurred in the Ukraine in 2004, that nation's judiciary could not openly recognize the corruption that marred that election.  It was not until the military started to "defect" by refusing to respond to directives from Ukrainian President Kuchma to disrupt and disburse citizens assembling in Maidan square in the center of Kiev that the Ukrainian Supreme Court suddenly felt safe to see what they were blind to previously—the massive corruption that infected the election.  Ackerman collaborated with York to make sure that, as with the other Documentary Films, the focus remained on the strategy and tactics of nonviolent resistance movements.  Ackerman ensured that the film showed a situation where nonviolent resistance tactics by the citizens sparked defections in the military control group, which then changed the risk calculus of other key control groups (here the judiciary) to effectuate dramatic but strategic nonviolent resistance.

51.59.  Ackerman's creative input and control over the Documentary Films was essential. Indeed, the entire thrust of the Documentary films—and Ackerman's motivation for financing them and contributing his original content to them—was Ackerman's (and ICNC's) desire to  use the Documentary Films to share Ackerman's unique insights on nonviolent resistance with dissident groups around the world.  Ackerman did not create the documentaries to generate commercial success.  In fact, Ackerman sought to avoid the typical elements of other documentaries on movements and the key individuals depicted in them.  The For example, the tactics illustrated, the order in which they appeared, and—importantly—the more commonplace features of documentaries that under Ackerman's insisted insistence be were omitted from the films to shape the overall look and feel, all manifest his creative contribution to the joint works.

52.60.  ICNC also was enlisted by YZI to review the content of written materials associated with their collaboration with ICNC, including study guides, and was given final approval rights before the Related Materials were distributed or translated.

53.61.  The Documentary Films and Related Materials were materially funded by Ackerman and, from 2002 onward, by ICNC as well.  This funding, which over the years amounted to approximately $20.9 million, not only encompassed the direct costs of developing and producing content for the Documentary Films and Related Materials, but also included payments of salary to York and Zimmerman, as well as overhead of YZI (including health insurance for York and Zimmerman).  To this end, YZI submitted regular budgets, and invoiced Ackerman and ICNC as development of the Documentary Films and Related Materials progressed.

54.62.  YZI has openly acknowledged Ackerman's contributions to developing the content of the Documentary Films.

55.63.  The "A Force More Powerful" website,

http://www.aforcemorepowerful.org/whoWeAre/index.php, which is managed by YZI, describes

Ackerman and DuVall (the founding director of ICNC) as, together with York and Zimmerman,

the "creative team" behind *A Force More Powerful* and *Bringing Down a Dictator*.

56.64.  The website further acknowledges that York, Zimmerman, Ackerman, and

DuVall "began collaborating on projects concerning nonviolent action in 1996."  A screen shot

from that website illustrating this is replicated below.



57.65.  YZI also acknowledged Ackerman's and ICNC's contributions to the

Documentary Films by crediting Ackerman, DuVall, and ICNC as follows:

(i)     *A Force More Powerful*: Ackerman is credited as Series Editor & Principle Content Advisor.  Jack DuVall is credited as Executive Producer;

(ii)    *Bringing Down a Dictator*: Ackerman is credited as Executive Producer;

(iii)   *Orange Revolution*: Ackerman is credited as Executive Producer;

(iv)    *Egypt: Revolution Interrupted?*: Ackerman is credited as Executive Producer;

(v)     *Confronting the Truth*: Ackerman is credited as Executive Producer, and YZI described the film as "[a] [p]roduction of York Zimmerman Inc. in

association with The United States Institute of Peace and the International

Center on Nonviolent Conflict."

58.66.  For almost two decades, Defendants recognized that this history of collaboration

with Ackerman and ICNC, and financial backing by Ackerman, established co-ownership of the

Documentary Films and Related Materials.

59.67.  In fact, none of the Documentary Films would have been made but for

Ackerman's creative contributions, his substantial direct and indirect financial support, and his

approval.

60.68.  The parties mutually intended and understood that a central and material element

of this collaboration was that Ackerman, as co-owner, would be able to use and distribute the

Documentary Films and Related Materials worldwide in support of ICNC's mission, without

limitation.

61.69.  For years, and consistent with the understanding of the parties, Ackerman and

ICNC used and distributed the Documentary Films as they pleased with the knowledge of, and

without objection from, YZI.  From 2000 to 2015 Ackerman and ICNC arranged more than 100

screenings and viewings of the Documentary Films for the public and for sizeable private

audiences.  ICNC and Ackerman also donated or distributed tens of thousands of copies of the

Documentary Films, with YZI's knowledge, worldwide and without limitation.

62.70.  One exception to this arrangement was a limited period of time when YZI had

negotiated, on behalf of the parties, an exclusive arrangement with an educational distributor to

sell the film *Orange Revolution* in the educational market (*i.e.*, schools and libraries).  In March

2010, however, YZI advised ICNC, including Messrs. Ackerman and DuVall, that it had

negotiated a new non-exclusive arrangement, and expressly acknowledged that effective March

10, 2010, both YZI and ICNC could distribute copies of *Orange Revolution* worldwide, in any language, without payment of a fee.

63.71.  Defendants, by their statements and conduct, confirmed that Plaintiffs had joint ownership of the Documentary Films and Related Materials, and never expressed any contrary understanding for so long as Ackerman reviewed and signed off on YZI's budgets, which included regular salary increases for York and Zimmerman.

72.    The situation changed, however, when after almost two decades of collaboration the Defendants embarked on a transparent shakedown of Ackerman.  Ackerman informed YZI in late 2014 that he wanted to tail off the relationship gradually, which resulted in a plan to fully end collaboration with and funding of YZI in June 2016.  The long period of lead time for ending funding was given by Ackerman as an accommodation to ease the transition for YZI.

73.     During the transitional period, it became logical for ICNC and Ackerman to stop using DVDs to distribute the Documentary Films, and instead to rely primarily on online streaming.  Ackerman informed York and Zimmerman that ICNC wanted to make the Documentary Films available online for free public viewing.  The objective was to promote ICNC's mission by using a distribution medium that was rapidly growing in importance, especially given the worldwide audience pursued by ICNC.  To provide for optimized online streaming of the Documentary Films, however, ICNC required sought access to higher quality source materials that were jointly owned by Ackerman, but which were maintained by YZI in its corporate office.

64.74.  In connection with these discussions between the parties about making the films available online for free, Defendants specifically represented to Plaintiffs that they would hand over physical possession of certain materials, including valuable raw interview footage, to ICNC.

In reliance on these promises, Ackerman and ICNC continued to pay Defendants hundreds of thousands of dollars in 2015.  Defendants further represented that they would make the parties' latest film, *Egypt: Revolution Interrupted?*, available online for free to anyone who wished to stream it.

65.75.  ~~YZI~~ During this transitional period, Defendants also acknowledged that Ackerman and ICNC were joint owners of the copyrights and other rights in the Documentary Films and Related Materials.  On February 4, 2016, York acknowledged to Ackerman during a meeting among the parties that all works created through the association of YZI, ICNC, and Ackerman were "jointly and severally held" by YZI, ICNC, and Ackerman.  On February 5, 2016, York again told ICNC that the works created through the association of YZI, ICNC, and Ackerman were "jointly and severally" held by YZI, ICNC, and Ackerman. York further told ICNC on Friday, February 5, 2016, that he would have master copies of all finished product delivered to ICNC within a week, by Friday, February 12.

66.76.  These statements by York are consistent with the arrangement that dates back to the very first collaboration between Ackerman and the Defendants, as it was always agreed and understood that Ackerman was the brainchild behind the Documentary Films and Related Materials, that he, along with York, created these works, and also was the primary benefactor without whom none of those works ever would have been produced.

67.77.  However, YZI never delivered to ICNC master copies of all finished jointly owned product by February 12, 2016—and has not subsequently delivered to ICNC such master copies—despite his statement on February 5, 2016, that he would do so.  Furthermore, on February 16, 2016, Ackerman was told by York and Zimmerman that he would need to sign a license agreement and pay YZI a licensing fee in order to use the Documentary Films, and that

Ackerman and ICNC, even with such a license, would have only limited rights to use some of the films, which would not include Internet streaming.

68.78.  This was the first time that York or Zimmerman ever objected to Ackerman's or ICNC's use of the Documentary Films, and was the first that YZI suggested that it was the sole owner of the Documentary Films and Related Materials.  Before 2016, Defendants had never demanded and formally proposed that a license periodically renewable at their discretion would be needed before Ackerman or ICNC could use or distribute the Documentary Films without restriction.

69.79.  It is no coincidence that when the Defendants saw that the collaborative and funding relationship with Ackerman and ICNC was ending that the Defendants looked for a way to extort additional payments from Ackerman and ICNC by attempting to deprive Ackerman, for the first time, to his rights as joint owner.  Continued use and distribution of the Documentary Films and Related Materials is essential to ICNC's mission.  Without the ability to stream the Documentary Films online, ICNC faces distribution restrictions that were never contemplated and that are in fact contradicted by the longstanding understanding and agreement of the parties.

70.80.  Accordingly, Plaintiffs now bring this action seeking a judicial declaration that Ackerman is an joint owner of the Documentary Films and Related Materials with defendant YZI, and that Defendants are prohibited required to provide Plaintiffs from withholding with master copies and any and all other source materials, including DVDs and electronic versions, for the Documentary Films and Related Materials.  In the alternative, Ackerman and ICNC seek a judicial declaration that they have a perpetual license to use and distribute the Documentary Films and Related Materials, which includes online streaming rights, and that Defendants are prohibited from withholding must provide Plaintiffs with master copies and any and all other

source materials for the Documentary Films and Related Materials.  In addition to these

declarations, Ackerman brings claims of breach of contract, fraud, negligent misrepresentation

and unjust enrichment against York and Zimmerman, and seeks an accounting ~~and~~

~~reimbursement~~ of all funds paid by Ackerman to the Defendants in connection with their joint

collaboration on the Documentary Films and the Related Materials.

**FIRST CLAIM FOR RELIEF**

**DECLARATORY JUDGMENT: JOINT OWNERSHIP**
**(BY VIRTUE OF JOINT AUTHORSHIP)**

~~71.~~81.  Plaintiffs incorporate by reference all previous and subsequent paragraphs of this

complaint as if fully set forth herein.

~~72.~~82.  Plaintiffs and York collaborated with each other for nearly twenty years with the

intention that their independent copyrightable contributions be merged into inseparable or

interdependent parts of a unitary whole, namely, the Documentary Films and Related Materials.

~~73.~~83.  Plaintiffs and York jointly created the Documentary Films and Related Materials,

which were all (with the exception of the film "Confronting the Truth") derived and adapted

from Ackerman's seminal work in the field of nonviolent resistance.  For example, Ackerman

served as Series Editor & Principal Content Advisor of *A Force More Powerful* and exercised

direct editorial control over the content of the series.  Ackerman also sat through "rushes" of

every Documentary Film before it was released, and made suggestions, ultimately adopted, as to

shortening or lengthening segments, commented on the script along the way, and made

suggestions, ultimately adopted, concerning scenes and concepts to include or omit.  Defendants

enlisted Ackerman to review the content of written materials, including study guides, and

- 25 -

Plaintiffs were given final approval rights before the Related Materials were distributed or translated.

74.84.   The Documentary Films and Related Materials (with the exception of "Confronting the Truth") are "joint works" within the meaning of the Copyright Act, 17 U.S.C. §101. Ackerman is a "joint author" within the meaning of Section 101 of that Act.

75.85.   There is an actual, immediate, and justiciable controversy among Plaintiffs and Defendants regarding the ownership of copyright rights in the Documentary Films and Related Materials. Defendants have suddenly, and for the first time in almost two decades, asserted sole ownership in those films and materials.

76.86.   Plaintiffs are entitled to a declaratory judgment that they are co-owners of the copyrights in the Documentary Films and Related Materials and that, as co-owners, their use and distribution of the Documentary Films and Related Materials would not infringe any rights of Defendants, and further that Defendants are prohibited from withholding required to provide Plaintiffs with master copies and any other source materials for the Documentary Films and Related Materials any and all source materials for the Documentary Films and Related Materials.

## SECOND CLAIM FOR RELIEF

## DECLARATORY JUDGMENT: OWNERSHIP (WORK FOR HIRE)

87.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

88.     The Documentary Films and Related Materials are "works made for hire" within the meaning of the Copyright Act, 17 U.S.C. § 101.  Defendants prepared the Documentary Films and Related Materials as employees of Ackerman and ICNC within the scope of their employment.  Ackerman and ICNC controlled the manner and means by which the Documentary

and Related Materials were created and paid York and Zimmerman salaries as well as their rent. During their twenty-year relationship, York and Zimmerman worked exclusively for Ackerman and did not have any other substantial sources of income.

89.     Plaintiffs are entitled to a declaratory judgment that they are owners of the copyrights in the Documentary Films and Related Materials and that, as owners, their use and distribution of the Documentary Films and Related Materials would not infringe any rights of Defendants, and further that Defendants are required to provide Plaintiffs with master copies and any other source materials for the Documentary Films and Related Materials

## THIRD CLAIM FOR RELIEF

## BREACH OF CONTRACT

90.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

91.     Plaintiff Peter Ackerman entered into a valid contract with Defendants whereby the parties agreed that Ackerman would be a co-owner of the Documentary Films and Related Materials and that, as a co-owner, Ackerman would have access to master copies of the films. The parties further agreed that Ackerman would have final approval on all of the films, and would be able to use the films however he wanted to disseminate his teachings on nonviolent civil resistance.

92.     Under the contract, Defendants were obligated to provide Ackerman access to master copies of the Documentary Films on request and allow Ackerman, as a co-owner, to use the films however he wanted to disseminate his teachings on nonviolent civil resistance to dissidents around the globe.

93.     Defendants breached the contract by refusing to provide Ackerman access to the Documentary Films, declaring themselves sole owners of all rights in the Documentary Films and Related Materials, and insisting that Plaintiffs would need to receive a license from Defendants and pay a licensing fee in order to use the films.

94.     Defendants' breach has caused Plaintiffs harm.  Without master copies of the Documentary Films, Plaintiffs are unable to disseminate the films to dissidents online with the quality that Plaintiffs envisioned, as is their right as co-owners of the films.

95.     Plaintiffs' harm cannot be adequately remedied through an award of money damages.  The Documentary Films and Related Materials have little, if any, commercial value.  Their value derives solely from their ability to teach dissidents the principles of strategic nonviolent conflict espoused by Peter Ackerman.  The foreign-translation versions in particular were made, and were funded by ICNC, to ensure that the Documentary Films could reach those who are most in need of the educational lessons embodied in them.  No amount of money could compensate Plaintiffs, much less the dissidents confronting authoritarian regimes for whom they are intended, for the loss of these unique and important teaching materials.  Accordingly, Plaintiffs are entitled to specific performance of the contract.

## FOURTH CLAIM FOR RELIEF ~~(IN THE ALTERNATIVE)~~

## DECLARATORY JUDGMENT: ORAL OR IMPLIED LICENSE

~~77.~~96.  Plaintiffs paid Defendants approximately $20.9 million to produce the Documentary Films and Related Materials.

~~78.~~97.  For almost twenty years, Defendants understood and, through their affirmative statements and conduct, acknowledged that beyond any rights to co-ownership, Plaintiffs had a perpetual right to use, display and distribute the Documentary Films and Related Materials which constitutes, at a minimum, a perpetual copyright license to do so in any manner and media

- 28 -

throughout the world. This license was manifested in express oral statements made by Defendants, such as York's acknowledgment that all works created through the association of YZI, ICNC, and Ackerman were "jointly and severally held" by YZI, ICNC, and Ackerman, as well as Zimmerman's written acknowledgment that Plaintiffs could distribute copies of *Orange Revolution* anywhere in the world.

79.98.  Plaintiffs' license to use and distribute the Documentary Films and Related Materials was also implied by Defendants' conduct. For example, Plaintiffs have arranged screenings and viewings of the Documentary Films for the public and sizeable private audiences more than 100 times in the past eighteen years and distributed tens of thousands of videocassettes and DVDs of the films around the world in more than twenty languages. Defendants are aware of, and had never objected to, such screenings or distribution, and they actively assisted Plaintiff's efforts to do so.

80.99.  There is an actual, immediate, and justiciable controversy among Plaintiffs and Defendants regarding Plaintiffs' rights to use the Documentary Films and Related Materials. Plaintiffs desire to stream the Documentary Films and Related Materials online, but Defendants have not only asserted exclusive ownership over them, but have wrongfully denied Plaintiffs the right to use the Documentary Films and Related Materials, improperly demanding additional consideration from Plaintiffs for such use and restricting such license rights that the Plaintiffs by law should enjoy.

81.100. Plaintiffs are entitled to a judgment declaring that they have a worldwide, unrestricted, perpetual license, including a copyright license, to use, display and distribute the Documentary Films and Related Materials, which includes online-streaming rights, and that Defendants are prohibited required to provide Plaintiffs with master copies and any other source

materials for the Documentary Films and Related Materials~~from withholding any and all source materials for the Documentary Films and Related Materials.~~

**~~THIRD~~ FIFTH CLAIM FOR RELIEF**

**FRAUD**

~~82.~~101. Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

102.     In 2014, Ackerman informed YZI that he would no longer be funding YZI, and suggested that YZI begin budgeting for a gradual phasedown of Ackerman's financial support. Around this same time, the parties began discussing making the films available online for free to any party wishing to stream them.  In connection with these discussions, in early 2015, Defendants falsely represented that they would transfer materials, including raw interview footage, to Plaintiffs.  Defendants further represented that they would make the parties' latest film, *Egypt: Revolution Interrupted?*, available online for free to anyone who wished to stream it, which was consistent with the parties' long-held understanding that the purpose of the films was to disseminate principles of strategic nonviolent conflict as broadly as possible to dissidents around the globe.  In February 2016, Defendants reaffirmed their prior representations by specifically promising to deliver the masters of all of the films to Plaintiffs within a week.

103.     Defendants' false representations were material.  Had Plaintiffs known Defendants had no intention of transferring the materials and would renege on their longstanding agreement to provide Plaintiffs with full, unfettered access to all of the material that was jointly created, Plaintiffs never would have continued to fund Defendants.

104.     Defendants made the statements knowing that they were false with the intent to deceive.  On information and belief, Defendants never intended to transfer the materials to

Plaintiffs, but rather promised to do so only for the purpose of extracting more funding from Plaintiffs.

105.    Plaintiffs reasonably relied to their detriment on Defendants' representations.  If Plaintiffs had known that Defendants' representations were false, Plaintiffs would not have continued to fund Plaintiffs.

106.    Defendants' representations caused Plaintiffs harm.  In 2015, Plaintiffs paid Defendants approximately $543,000 that they would not have paid had they known Defendants' representations were false.

83.    Defendants fraudulently induced Plaintiffs to enter into a joint enterprise of nearly twenty years whereby Plaintiffs would devote significant time, money and expertise, ostensibly for the joint benefit of both parties.  Over the course of this joint enterprise, Defendants induced Plaintiffs to pay $20.9 million in funding to Defendants based on Defendants' false representations that Plaintiffs would have joint ownership rights in the Documentary Films and Related Materials or, alternatively, unlimited license rights, in all works created by the enterprise, including the unfettered right to use and distribute these works.

84.    Defendants made numerous false representations to Plaintiffs to lead them to believe that, because they were providing the content, supervision, and funding for the Documentary Films and Related Materials, Plaintiffs would have joint ownership rights in the works.  For example, in a February 28, 2006 e-mail to Jack DuVall of ICNC, York stated that because "ICNC pays the bills," it was "entitled to call the tune."

85.    Similarly, on March 10, 2010, Miriam Zimmerman wrote in an e-mail to Peter Ackerman, Jack DuVall, and others that she was able to negotiate a new arrangement with an education distributor for *Orange Revolution* whereby the distributor's deal to sell the film in the

educational market would be non-exclusive.  Zimmerman stated, "This means, effective today, March 10, 2010, YZI *and ICNC* can sell/donate/distribute copies of Orange Rev[olution] to schools and libraries *anywhere in the world, in any language*, without having to pay [the distributor] a fee." (emphases added).

86.     Defendants also falsely represented that they would use Ackerman's funding to secure and maintain all necessary third-party rights in the films.  On a regular basis, and at least annually, Zimmerman would request funding which she represented would be used in part to secure and maintain third party rights to enable ICNC to fulfill its mission.  On frequent occasions, Zimmerman would boast that she "runs a tight shop" or words to that effect, and induced Ackerman to provide additional funding when she knew or should have known at the time she made these statements that in fact she had neglected to secure or maintain all third-party rights.  In fact, Defendants allowed third-party rights to lapse, contrary to their affirmative representations to Ackerman and ICNC, while they pocketed the funding Ackerman provided for this very purpose.

87.     Defendants' false representations to Plaintiffs regarding their ownership rights in the Documentary Films and Related Materials were material.  Plaintiffs never would have invested millions of dollars in the joint enterprise had they known Defendants would assert the unilateral right to effectively cut off distribution of the works.

88.     Defendants made the false representations for the purpose of inducing Plaintiffs to fund them, but never intended to respect Plaintiffs' joint ownership rights.  Only when Plaintiffs began to phase down their funding of Defendants did Defendants reveal their true intentions— that, after twenty years and $20.9 million from Plaintiffs, Defendants would assert *sole*

ownership of the Documentary Films and Related Materials, demanding that Defendants sign a license agreement and pay a royalty.

89.    Plaintiffs relied on Defendants' representations to their detriment. They provided millions of dollars of funding to Defendants in reliance on their representations that they would produce the Documentary Films and Related Materials and that Plaintiffs and Defendants would own them jointly, with unlimited rights to use and distribute them.

90.    As a result of Defendants' fraud, Plaintiffs have been deprived of the valuable right to exploit the Documentary Films and Related Materials that would not exist without Plaintiffs' contributions of content, supervision, and funding. Accordingly, Plaintiffs are entitled to a return of the $20.9 million that they paid Defendants in reliance of their false representations.

**FOURTH SIXTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENTNEGLIGENT MISREPRESENTATION**

107.    Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

108.    As described in paragraph 102 and throughout this Complaint, Defendants in early 2015 made numerous false statements to Plaintiffs about their intentions to turn over the Documentary Films and Related Materials, including their statements that they would transfer valuable interview footage to Plaintiffs.

109.    Defendants' false statements were material.

110.    Plaintiffs reasonably relied to their detriment on Defendants' false statements.  As noted, iIf Plaintiffs had known that Defendants' statements were false, Plaintiffs would not have continued to fund Plaintiffs.

111.   Defendants' false statements caused Plaintiffs harm.  In 2015, Plaintiffs paid Defendants approximately $543,000 that they would not have paid had they known Defendants' statements were false.

**SEVENTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

91.112.In addition to the services Plaintiffs provided Defendants discussed above, Plaintiffs also conferred a benefit on Defendants in the form of approximately $543,000$20.9 million in funding to produce the Documentary Films and Related Materials in 2015.

92.113.Defendants have retained that benefit under circumstances that are unjust._The parties mutually intended and understood that Plaintiffs would be co-owners of the Documentary Films and Related Materials, but now Defendants claim that they are their sole owners. Plaintiffs never would have funded Defendants had they known Defendants would assert the unilateral right to effectively cut off distribution of the Documentary Films and Related Materials. Moreover, Defendants specifically represented to Plaintiffs in early 2015 that they would transfer raw interview footage to Plaintiffs and make the film *Egypt: Revolution Interrupted?* available online for free for anyone to view.  In fact, Plaintiffs had no intention of following through on these promises, which were simply made to ensure that Plaintiffs would continue to fund Defendants through 2015.

93.114.Plaintiffs are therefore entitled to the funding they provided Defendants in 2015 in reliance on Defendants' false promises, which funding totals approximately $543,000.fair value of their contributions to the resulting profits, proceeds, and exploitation of the Documentary Films and Related Materials realized by Defendants, including without limitation disgorgement of all "salary" paid to defendants York and Zimmerman.

- 34 -

## FIFTH CLAIM FOR RELIEF

## ACCOUNTING

~~94.~~115.Plaintiffs incorporate by reference all previous and subsequent paragraphs of this complaint as if fully set forth herein.

~~95.~~116.By virtue of their co-ownership of the Documentary Films and Related Materials, Plaintiffs are entitled to an accounting by Defendants of all revenue earned from the Documentary Films and Related Materials, pursuant to which Plaintiffs can determine the money rightfully belonging to them.

~~96.~~117.Plaintiffs are further entitled to an accounting of all funds paid by Ackerman to the Defendants in connection with their joint collaboration on the Documentary Films and the Related Materials.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.     Declaring that Plaintiffs are co-owners of the rights, including the copyrights, in the Documentary Films and Related Materials.~~, and that~~

~~1.~~2.     Ordering Defendants ~~are prohibited from withholding from~~to provide Plaintiffs with master~~s or electronic versions of the works at issue.~~Documentary Films and Related Materials. copies and any other source materials for the Documentary Films and Related Materials.

~~2.~~3.     In the alternative, declaring that Plaintiffs hold a worldwide, unrestricted, irrevocable and perpetual license, including a copyright license, to use, display and distribute the Documentary Films and Related Materials in all manner and media now existing and hereinafter

created, including without limitation online streaming rights, and ~~that~~ ordering Defendants ~~are~~

~~prohibited from withholding~~to provide Plaintiffs with ~~any and all source materials for~~ master

copies and any other source materials for the Documentary Films and Related Materials.~~the~~

~~Documentary Films and Related Materials.~~

~~3.~~4.     Awarding Plaintiffs monetary relief comprising, among other things, the

approximately$543,000 ~~$20.9 million~~ in funding that Plaintiffs provided Defendants in 2015, as

well as attorneys' fees and costs.


By  _____

William M. Bosch (D.C. Bar No. 444247)
John Robinson (D.C. Bar No. 1044072)
ARNOLD & PORTER
         KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
E-mail:  william.bosch@apks.com

*Counsel for Plaintiffs*


*Of Counsel*:

Roberta L. Horton
ARNOLD & PORTER
         KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
E-mail:roberta.horton@apks.com


Dated:  ~~April~~ _____28, 201~~7~~6